IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JOHN HARRIS,<br>*Plaintiff*,<br><br>  v.<br><br>BIOMET ORTHOPEDICS, LLC, *et al.*,<br>*Defendants*. | Civil Action No. ELH-18-3924 |
| STEPHEN HARBOLD,<br>*Plaintiff*,<br><br>  v.<br><br>BIOMET ORTHOPEDICS, LLC, *et al.*,<br>*Defendants*. | Civil Action No. ELH-18-3925 |
| SIDNEY KANDEL,<br>*Plaintiff*,<br><br>  v.<br><br>BIOMET ORTHOPEDICS, LLC, *et al.*,<br>*Defendants*. | Civil Action No. ELH-18-3864 |
| PAULETTE RINGLEY,<br>*Plaintiff*,<br><br>  v.<br><br>BIOMET INC., *et al.*,<br>*Defendants*. | Civil Action No. ELH-17-747 |

## MEMORANDUM OPINION

These product liability cases are rooted in an allegedly defective orthopedic device used for hip replacements. Defendants Biomet Orthopedics, LLC; Biomet Inc.; Biomet Manufacturing, LLC; and Biomet U.S. Reconstruction, LLC (collectively, "Biomet") designed and manufactured the M2a Magnum Metal-on-Metal Hip System (the "Magnum"). Plaintiffs John Harris, Sidney Kandel, Stephen Harbold, and Paulette Ringley, all of whom were implanted with a Magnum between 2008 and 2010, filed suit against Biomet, alleging that the Magnum caused substantial injuries, necessitating subsequent hip replacement surgeries. *See* ELH-18-3924, ECF 7 (Harris Amended Complaint); ELH-18-3925, ECF 1 (Harbold Complaint); ELH-18-3926, ECF 1 (Kandel Complaint); ELH-17-747, ECF 1-3 (Ringley Complaint).[1] In particular, plaintiffs allege that the Magnum's metal-on-metal design caused the device to corrode, releasing metallic debris into the bloodstream that killed surrounding tissue and bone. Further, plaintiffs assert that Biomet advertised the Magnum as safe despite knowing that it was defective.

---

[1] Mr. Harris, Mr. Harbold, and Mr. Kandel, all of whom are represented by the same counsel, filed suit in federal court in Indiana against Biomet Orthopedics, LLC; Biomet Inc.; and Biomet Manufacturing, LLC. ELH-18-3924, ECF 1, ECF 7; ELH 18-3925, ECF 1; ELH-18-3926, ECF 1. Mr. Harris filed suit in 2014, and initially also named Biomet Manufacturing Corp. and Biomet U.S. Reconstruction, LLC as defendants. But, he later dropped those entities from his suit. Mr. Harbold and Mr. Kandel filed suit in 2016.

Ms. Ringley filed suit in this District, and the case was originally assigned to Judge Richard Bennett. Ms. Ringley sued Biomet Inc.; Biomet Orthopedics, LLC; Biomet U.S. Reconstruction, LLC; and Biomet Manufacturing Corp. *See* ELH-17-747, ECF 1-3. However, during proceedings in the MDL, Judge Miller dismissed the suit as to all Biomet corporate entities other than Biomet, Inc.; Biomet Orthopedics, LLC; Biomet Manufacturing, LLC; and Biomet U.S. Reconstruction, LLC. *See* MDL-2391, Dkt. No. 2972. Accordingly, Biomet Manufacturing Corp. is no longer a proper defendant.

Plaintiffs lodge claims exclusively under Maryland law, including strict products liability, negligence, breach of express and implied warranties, fraudulent concealment, and negligent misrepresentation. Jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332.

These cases were among many filed against Biomet. On October 2, 2012, pursuant to 28 U.S.C. § 1407, the Joint Panel on Multidistrict Litigation ("JPML"), consolidated all cases involving Biomet's Magnum into a Multi-District Litigation action ("MDL") for coordinated pretrial proceedings. *See In re: Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*, 896 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012). The MDL was assigned to Judge Robert Miller, Jr. of the United States District Court for the Northern District of Indiana. *Id.* After extensive pretrial proceedings, the *Harbold*, *Kandel*, and *Harris* matters were transferred from the MDL to the District of Maryland on December 12, 2018, as part of the second remand group. MDL-2391, MDL Dkt. No. 3738; *see* ELH-18-3924, ECF 181; ELH-18-3925, ECF 93; ELH-18-3926, ECF 93. The *Ringley* case was remanded to this District on March 11, 2019, as part of the third remand group. MDL-2391, Dkt. No. 3766; *see* ELH-17-747, ECF 11.[2]

Plaintiffs filed a joint motion to consolidate on June 14, 2019, pursuant to Fed. R. Civ. P. 42(a), supported by a memorandum of law. *See* ELH-18-3924, ECF 196, ECF 196-1; ELH-18-3925, ECF 112, ECF 112-1; ELH-18-3926, ECF 109, ECF 109-1; ELH-17-747, ECF 22, ECF 22-

---

[2] At the time of the filing of this Memorandum Opinion, three other lawsuits are pending against Biomet in this District. *See McCoy v. Biomet Orthopedics, LLC*, ELH-12-1436 (D. Md.); *Oswald v. Biomet Orthopedics, LLC*, ELH-19-607 (D. Md.); *Laughlin v. Biomet, Inc*., ELH-14-1645 (D. Md.). McCoy and Oswald have filed a motion to consolidate their actions. *See McCoy v. Biomet, Orthopedics, LLC*, ELH-12-1436, ECF 54 (D. Md.). And, Laughlin has filed a motion to consolidate her case with the other pending suits. *See Laughlin v. Biomet, Inc*., ELH-14-1645, ECF 45 (D. Md.). However, she has not specified the particular group that she seeks to join.

The cases of *Fowler v. Biomet Orthopedics, LLC*, ELH-19-2931 (D. Md.), and *Soustek v. Biomet Mfg. Corp.*, ELH-15-1890 (D. Md.), have recently settled.

1 (collectively, the "Motion").[3]  Defendants oppose consolidation.  ECF 199 ("Opposition").

Sixteen exhibits are appended to the Opposition.  ECF 199-3 to ECF 199-18.  Plaintiffs filed a

reply (ECF 200, "Reply"), along with six exhibits.  ECF 200-2 to ECF 200-8.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105(6).  For the reasons

that follow, I shall grant plaintiffs' Motion.

## I.  Factual and Procedural Background

### A.  Biomet's Magnum

The hip joint connects the thigh bone (the femur) to the pelvis.  ELH-18-3924, ECF 7, ¶ 9.

It operates like a ball and socket: the femoral head, a ball-like structure that sits at the top of the

femur bone, rotates within the cupped surface of the pelvis, or acetabulum.  *Id.*  In a healthy hip,

the femoral head and acetabulum are cushioned and lubricated by cartilage and fluid.  *Id.*

A total hip implant replaces the body's natural joint with an artificial one.  *Id.* ¶ 10.

Generally, a hip implant consists of four parts, as depicted in the diagram that follows:  a (1)

femoral stem; (2) femoral head; (3) plastic (polyethylene) liner; and (4) acetabular shell.  *Id.*[4]

---

[3] Plaintiffs filed the same motion in each case.  Hereafter, I shall cite primarily to the *Harris* case: ELH-18-3924.  Citations to the Opposition and its exhibits likewise correspond to the filings in *Harris*.  The Opposition and exhibits are docketed at ECF 199 in ELH-18-3924; ECF 113 in ELH-18-3925; ECF 112 in ELH-18-3926; and ECF 25 in ELH-17-747.

[4] The diagram was taken from the complaint of another Biomet suit.  *See McCoy v. Biomet Orthopedics, LLC*, ELH-12-1436, ECF 1 at 5 (D. Md.).



Unassembled Total Hip      Assembled Total Hip

During the operation, the surgeon first hollows out the patient's femur bone and inserts the femoral stem. Next, the surgeon attaches the femoral head to the stem. Finally, the surgeon inserts the liner and acetabular shell to separate the metal femoral head from the acetabulum. *Id.*

Biomet's Magnum has only three parts: a stem, femoral head, and shell. ELH 17-747, ECF 1-3, ¶ 26. The Magnum's femoral head and acetabular shell are both made out of metal. *Id.* This kind of hip implant is known as a metal-on-metal (MoM) system. *Id.*

Plaintiffs allege that the Magnum was not sufficiently tested, and that the United States Food and Drug Administration ("FDA") never approved the device as being safe and effective. ELH-18-3924, ECF 7, ¶ 13. Nonetheless, Biomet allegedly claimed that the Magnum would outlast a conventional hip implant with a polyethylene liner. ELH 17-747, ECF 1-3, ¶ 27. During the Magnum's initial release, Biomet promoted the device to surgeons as "'designed specifically to address the issues of wear debris' and 'the right choice for use in young, highly active patients.'" *Id.* ¶ 28. Further, Biomet hired gymnast Mary Lou Retton to promote the Magnum in direct-to-consumer print, TV, and radio advertising. *Id.* ¶ 29.

According to plaintiffs, the grinding of the Magnum's metal "ball" against the metal "socket" causes tiny fragments of chromium and cobalt to slough off into the bloodstream. *Id.*

¶ 31; ELH 18-3924, ECF 7, ¶ 12. This metal debris kills soft tissue and bone near the hip, "prompt[ing] the body to react by rejecting the hip implant." ELH-18-3924, ECF 7, ¶ 12. Symptoms include pain and severe inflammation. *Id.* This corrosion also causes the Magnum to loosen, dislocate, and fracture. *Id.*; ELH-17-747, ECF 1-3, ¶ 31. As a result of these complications, patients implanted with a Magnum often require "revision" surgery, whereby the Magnum is removed and replaced with a new hip implant. ELH-17-747, ECF 1-3, ¶ 38.

Biomet allegedly knew that the Magnum was defective. *Id.* ¶ 34; ELH 18-3924, ECF 1, ¶¶ 15-16. As early as 2006, the FDA and Biomet received reports of patients having adverse reactions to the Mangum, with many undergoing revision surgeries. *Id.* ¶ 17; ELH 17-747, ECF 1-3, ¶ 31. And, the FDA and its British counterpart had expressed concern about MoM implants. ELH-17-747, ECF 1-3, ¶ 33.

However, despite knowing about issues with the Magnum, Biomet neither pulled the device from the market nor warned the public. *Id.* ¶ 32. Instead, Biomet aggressively advertised the Magnum as superior to other hip implants. *Id.* Biomet allegedly claimed, falsely: "'The M2a-Magnum™ Large Metal Articulation System offers optimal joint mechanic restoration and ultra low-wear rates in vivo'" and "'Many studies conducted over the last several decades have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants.'" *Id.* ¶ 34. And, Biomet published marketing brochures targeting doctors, touting the safety and durability of MoM devices. ELH-18-3924, ECF 7, ¶ 19. According to plaintiffs, Biomet intentionally concealed Magnum's defects because it was one of Biomet's most profitable products, and Biomet was seeking to be acquired. ELH-17-747, ECF 1-3, ¶ 35.

## B. Plaintiffs' Medical Histories

### 1. Mr. Harris

Mr. Harris suffers from severe osteoarthritis in both hips, hip bursitis, and degenerative disc disease. ELH-18-3924, ECF 199-12 ("Ex. I," Harris Medical Records) at 4-5, 11; ECF 199-18 ("Ex. O," Harris Deposition) at 9-10. Mr. Harris underwent a left hip replacement at Frederick Memorial Hospital in Frederick, Maryland on September 15, 2008. Ex. I at 6. Dr. Robert Fisher implanted a Magnum in Mr. Harris's left hip. *Id.* At the time of the surgery, Mr. Harris was 67 years old. *Id.* On October 28, 2009, he had a revision surgery on his left hip during which he received a new liner and femoral head. *Id.* at 21-22. That operation was performed by Dr. Christopher Cannova at Suburban Hospital in Bethesda, Maryland. *Id.* Before receiving a Magnum hip replacement, he had a right hip replacement that has not been revised. Ex. I at 2-5.

### 2. Mr. Harbold

Mr. Harbold's medical history is significant for Perthes disease, osteoarthritis, and scoliosis. ELH-18-3924, ECF 199-8 ("Ex. F-1," Harbold Medical Records) at 3, 10; ECF 199-19 ("Ex. F-2," Harbold Medical Records) at 7. He received a left hip implant in 1999. Ex. F-1 at 7. Mr. Harbold underwent a right hip replacement with a Magnum device on February 9, 2010. Ex. F-1 at 3. The surgery was performed by Dr. Daniel Bauk at MedStar St. Mary's Hospital in Leonardtown, Maryland. *Id.* Mr. Harbold was 46 years old at the time of this hip replacement. *Id.* at 7. The Magnum device in Mr. Harbold's right hip was revised on May 12, 2014, by Dr. Nitin Goyal at Inova Mount Vernon Hospital in Alexandria, Virginia. Ex. F-2 at 2-6. Mr. Harbold received a new acetabular shell with a polyethylene liner and a new femoral head that was ceramic rather than metal. *Id.* at 6.

### 3. Mr. Kandel

Mr. Kandel has a number of medical conditions, including osteoporosis. ELH-18-3924, ECF 199-11 ("Ex. H," Kandel Medical Records) at 10. On December 1, 2008, Dr. Robert Fisher implanted a Magnum device in Mr. Kandel's left hip. *Id.* at 2-3. The surgery occurred at Frederick Memorial Hospital in Frederick, Maryland. *Id.* Mr. Kandel was 60 years old at the time of this hip replacement. *Id.* at 2. The Magnum device in Mr. Kandel's right hip was revised on November 19, 2014, by Dr. Henry Boucher at Union Memorial Hospital in Baltimore, Maryland. *Id.* at 16-17. Dr. Boucher implanted a new device made of materials different from those in the Magnum. *Id.* at 18.

### 4. Ms. Ringley

Ms. Ringley's medical history includes a traumatic hip fracture from a car accident, posttraumatic osteoarthritis, degenerative joint disease in her right hip, right knee arthrofibrosis, severe right ankle osteoarthritis, and midfoot arthritis. ELH-18-3924, ECF 199-13 ("Ex. J," Ringley Medical Records") at 2-4. On August 31, 2010, Ms. Ringley had a Magnum device implanted in her right hip. *Id.* at 2. She was 52 years old at the time. *Id.* at 6. The operation was performed by Dr. Barry Waldman at Sinai Hospital in Baltimore, Maryland. *Id.* at 4. Ms. Ringley underwent an operation to revise the Magnum device on June 16, 2014, *id.* at 20, performed by Dr. Sam Sydney at St. Agnes Hospital in Baltimore, Maryland. *Id.* She received a new acetabulum and femoral head. *Id.* at 21.

### C. Procedural History

As noted, on October 2, 2012, the JPML created MDL No. 2391 in the Northern District of Indiana, assigning Judge Miller to coordinate pretrial proceedings for all lawsuits alleging defects with Biomet's Magnum. *See In re: Biomet*, 896 F. Supp. 2d at 1341. At the time, Biomet

opposed centralization, arguing that "individualized, plaintiff-specific issues will predominate among the actions." *Id.* at 1339-40. But, the JPML rejected that contention. It observed that "'almost all injury litigation involves questions of causation that are case- and plaintiff-specific. Such differences have not been an impediment to centralization in the past.'" *Id*. at 1340 (quoting *In re Wright Med. Tech., Inc., Conserve Hip Implant Prods. Liab. Litig*., 844 F. Supp. 2d 1371, 1372 (J.P.M.L. 2012)). And, it found that the "central issues in these cases may well be whether a common defect has led to the injuries alleged." *Id.* Thus, because the lawsuits "share factual questions concerning design, manufacture, marketing and performance of Biomet's M2A Magnum system," the JPML concluded that "centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation[.]" *Id.*

"To eliminate delays associated with the transfer cases from other federal district courts to [the MDL] and to promote judicial efficiency," Judge Miller permitted any plaintiff whose case would have been subject to transfer to MDL No. 2391 to file his or her case directly in the Northern District of Indiana. MDL-2391, Dkt. No. 3096. However, direct filing was "contingent on the understanding that upon completion of all pretrial proceedings . . . th[e] court w[ould], pursuant to 28 U.S.C. § 1404(a), transfer the case to a federal district of proper venue, as defined by 28 U.S.C. § 1391, unless the parties expressly agree to an alternate venue." *Id.*

Plaintiffs separately filed suit against Biomet. Mr. Harris filed his Complaint (ECF 1) in the Northern District of Indiana on October 23, 2014, which he amended shortly thereafter. ELH-18-3924, ECF 7. Mr. Harbold filed his Complaint in the Northern District of Indiana on March 18, 2016. ELH-18-3925, ECF 1. On March 18, 2016, Mr. Kandel filed his Complaint in the Northern District of Indiana. ELH-18-3926, ECF 1. Ms. Ringley filed suit on March 19, 2017, in

the District of Maryland (ECF 1-3); her case was transferred to the MDL on April 20, 2017. ELH-17-747, ECF 10.

As noted, plaintiffs lodge claims against Biomet under Maryland law. The complaints of Mr. Harris, Mr. Harbold, and Mr. Kandel contain the same eight counts: "Strict Liability: Manufacturing Defect" (Count I); "Strict Liability: Failure to Warn" (Count II); negligence (Count III); negligent design (Count IV); fraudulent concealment (Count V); breach of implied warranties (Count VI); breach of express warranties (Count VII); and punitive damages (Count VIII). *See, e.g.*, ELH-18-3924, ECF 7 at 8-19. Ms. Ringley's Complaint asserts nine "Causes of Action" and includes an additional Biomet defendant. The claims are as follows: "Strict Products Liability (Design Defect)"; "Strict Products Liability (Failure to Warn)"; "Manufacturing Defect and Failure to Adhere to Qualify Controls"; breach of express warranty; breach of implied warranty of merchantability; breach of implied warrant of fitness for a particular purpose; negligence; negligence misrepresentation; and "Violation of Consumer Fraud Law," Md. Code, § 13-301, *et seq.* of the Commercial Law Article. ELH-17-747, ECF 1-3 at 14-35.

As indicated, Judge Miller transferred the *Harbold*, *Kandel*, and *Harris* matters to the District of Maryland on December 12, 2018. MDL-2391, Dkt. No. 3738; *see* ELH-18-3924, ECF 181; ELH-18-3925, ECF 93; ELH-18-3926, ECF 93. And, as noted, the *Ringley* case was remanded to the District on March 11, 2019. MDL-2391, Dkt. No. 3766; ELH-17-747, ECF 11. In the transfer order, Judge Miller explained that of the approximately 3,000 cases that were part of the MDL, 90% had settled as part of a master settlement agreement arrived at in 2014. *See* MDL-2391, Dkt. No. 3738 at 2-3, 6; *see also* MDL-2391, Dkt. No. 1317 (Master Settlement Agreement). Accordingly, the remaining cases were being sent to their proper districts for trial. MDL-2391, Dkt. No. 3738 at 13. Further, Judge Miller observed, *id.*:

Any case might present its own atypical need, but for the most part, here is what will be left to do after remand: (1) additional, non-duplicative, case-specific depositions; (2) disclosure of case-specific experts, service of case-specific expert reports, and case-specific expert depositions; (3) any motions addressing the testimony of case-specific experts; (4) any motions (or, perhaps, trial objections) directed to the recorded trial testimony of the plaintiffs' generic experts; (5) any other motions addressing the testimony of generic or case-specific experts; and (6) any summary judgment motions.

## II.    Discussion

### A.  Rule 42

Rule 42(a) of the Federal Rules of Civil Procedure governs the consolidation of cases for trial.  It provides:

(a) CONSOLIDATION.  If actions before the court involve a common question of law or fact, the court may:

(1) join for hearing or trial any or all matters at issue in the actions;

(2) consolidate the actions; or

(3) issue any other orders to avoid unnecessary cost or delay.

(b) SEPARATE TRIALS.  For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.  When ordering a separate trial, the court must preserve any federal right to a jury trial.

The Rule "permits, but does not mandate, consolidation of cases that involve a common question of law or fact."  *CX Reinsurance Co. v. Leader Realty Co.*, JKB-15-3054, 2016 WL 6696050, at *1 (D. Md. Nov. 15, 2016).  The district court is vested with "broad discretion to decide whether consolidation under Rule 42(a) would be desirable . . . ."  9A C. WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2383 (3d ed. 2019); *see also, e.g.*, *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 959 (4th Cir. 1999) (noting the discretion of the district court under Rule 42(a)).

In making its determination, a district court must "weigh the saving of time and effort that consolidation under Rule 42(a) would produce against any inconvenience, delay, or expense that

it would cause for the litigants and the trial judge." WRIGHT & MILLER, § 2383. The Fourth Circuit has said:

> The critical question for the district court in the final analysis was whether the specific risks of prejudice and possible confusion were overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982), *rev'd on other grounds,* 712 F.2d 899 (4th Cir. 1983) (en banc); *see also Campbell v. Bos. Sci. Corp.*, 882 F.3d 70, 74 (4th Cir. 2018) (applying the *Arnold* factors); *CX Reinsurance Co.*, 2016 WL 6696050 at *1-2; *CSX Transp., Inc. v. Alban Waste*, *LLC*, JKB-13-1770, 2014 WL 1340041, at *2 (D. Md. Apr. 2, 2014); *Dring v. Faust*, WDQ-12-2344, 2013 WL 657638, at *1 (D. Md. Feb. 21, 2013).

Notably, "the mere fact that a common question is present, and that consolidation therefore is permissible under Rule 42(a), does not mean that the trial court judge must order consolidation.[1]" WRIGHT & MILLER, § 2383. Moreover, a court need not consolidate for trial, but may instead consolidate cases "in their pretrial stage" as "a desirable administrative technique[.]" *Id*. § 2382; *see also Rishell v. Computer Scis. Corp.*, No. 1:13-CV-931, 2014 WL 11515835, at *1 (E.D. Va. Apr. 4, 2014) ("[I]ncluded within [a district court's] discretion is consolidation for discovery and pre-trial purposes.").

## B. Analysis

### 1. Common questions of fact and law

Plaintiffs argue that consolidation is appropriate because they share common questions of fact and law. ECF 196-1 at 5. The Motion points out many factual similarities among the plaintiffs. *Id.* And, plaintiffs stress that their lawsuits share the same "cornerstone": the "alleged failure to warn and failure to properly account for the risks in design of Biomet's metal-on-metal

hip systems." *Id.* Consequently, plaintiffs aver that the "bulk of evidence each Plaintiff will present at trial will be the same." *Id.*

In response, Biomet argues vigorously that plaintiffs' suits are rife with individual issues. ECF 199 at 16-24. In particular, Biomet details plaintiffs' medical histories, which it maintains "share few common issues of fact." *Id.* at 16. Biomet contends that plaintiffs have "different attributes (e.g., age, gender), different medical histories (e.g., pre-existing conditions, past surgeries, etc.), and different implant and revision experiences (e.g., postoperative complications, symptoms, surgical findings, etc.)." *Id.* at 13. In light of these differences, Biomet warns that consolidation would produce a "towering mass of litigation." *Id.* at 19.

The case of *Campbell v. Boston Scientific Corporation*, 882 F.3d 70 (4th Cir. 2018), is instructive. There, the Fourth Circuit reviewed the propriety of consolidating for trial four medical device products liability cases. The plaintiffs in *Campbell* were four women who had been implanted with transvaginal mesh, a medical device manufactured by Boston Scientific Corporation ("BSC") to treat severe stress urinary incontinence. *Id.* at 73. Plaintiffs separately filed suit against BSC, alleging that the device's defects were responsible for the post-implantation complications they experienced. *Id.* They sought compensatory and punitive damages "based on theories of negligence and strict liability for both design defects and failure to warn." *Id.*

The plaintiffs' cases were transferred to an MDL in the Southern District of West Virginia, which consolidated their cases with seven others for trial. After six cases were dismissed and one was removed from the consolidated action, BSC moved to separate the four remaining cases for trial. The district court denied the motion. *Id.* Following an eleven-day trial, the jury returned verdicts in favor of plaintiffs, awarding each plaintiff $250,000 in past compensatory damages, $1 million in punitive damages, and future compensatory damages ranging from $3 million to $4

million.  *Id.*  BSC appealed, arguing, *inter alia*, that the district court abused its discretion by consolidating the cases under Rule 42(a) because individual issues predominated.

The Fourth Circuit rejected this challenge.  *Id.* at 76.  It reasoned, *id.*:

> The district court . . . . first identified the many common questions of law and fact across the trials: The four plaintiffs were each diagnosed with stress urinary incontinence before being implanted with Obtryx devices made by BSC. Each plaintiff alleged that she had experienced similar complications from the Obtryx that required additional medical treatment. Each plaintiff received her Obtryx implant in West Virginia and asserted the same design-defect and failure-to-warn claims under West Virginia law. Because of these many similarities among the cases, the plaintiffs shared expert witnesses and relied on much of the same evidence from BSC documents. BSC asserted in all four cases both that the Obtryx was not defective and that the Obtryx's directions for use provided sufficient warnings. These many similarities certainly provided the "common question[s] of law or fact" required by Rule 42(a). They also make clear that separate trials would have been largely repetitive, and thus would have implicated the burdens, delays, and expense that *Arnold* noted help justify consolidation.

Here, plaintiffs' lawsuits share the same common questions of fact present in *Campbell*. Plaintiffs are all citizens of Maryland.  ELH-18-3924, ECF 7, ¶ 1; ELH-18-3925, ECF 1, ¶ 1; ELH-18-3926, ECF 1, ¶ 1; ELH-17-747, ECF 1-3, ¶ 3.  They were all implanted with Biomet's Magnum hip implant.  ELH-18-3924, ECF 7, ¶ 22; ELH-18-3925, ECF 1, ¶ 22; ELH-18-3926, ECF 1, ¶ 22; ELH-17-747, ECF 1-3, ¶¶ 3, 42.  Their implantations occurred in the same two-year window.  *See* Ex. L at 1 (Mr. Kandel and Mr. Harris were implanted in 2008; Mr. Harbold and Ms. Ringley received their implants in 2010).  And, their surgeries occurred in Maryland.  Ex. I at 8; Ex. F-1 at 3; Ex. H at 10; Ex. J at 4.  Indeed, the same surgeon implanted the Magnum in Mr. Harris and Mr. Kandel.  Ex. I at 8; Ex. H at 2.

Notably, plaintiffs also complain of the same injuries.  Three of the four plaintiffs tested as having high levels of cobalt and chromium in their bloodstream.  Ex. L at 2.  And, they all allege that they experienced pain and discomfort in the hip that was replaced with a Magnum.  ELH-18-3924, ECF 7, ¶ 42; ELH-18-3925, ECF 1, ¶ 43; ELH-18-3926, ECF 1, ¶ 43; ELH-17-747, ECF 1-

3, ¶ 43.  Moreover, all four plaintiffs underwent a revision surgery in the hip implanted with the

Magnum.  Ex. I at 21-22; Ex. F-1 at 6; Ex. H at 18; Ex. J at 20.  These are material commonalities.

*See Campbell*, 88 F.3d at 74; *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab.

*Litig.*, No. 3:11-MD-2244-K, 2016 WL 10719395 at *2 (N.D. Tex. Jan. 8, 2016) (consolidating

five cases for bellwether trial against a hip implant device manufacturer; observing that plaintiffs

"experienced similar implantation procedures, and . . . experienced similar complications").

To be sure, plaintiffs are not identical.  Indeed, Biomet describes each plaintiff's medical

history in painstaking detail.  *See* ECF 199 at 20-23; Ex. L (comparing plaintiffs' characteristics).

These differences include their preoperative diagnoses; the plaintiffs' ages when the Magnum was

implanted; the duration of implantation; and the plaintiffs' lifestyle and background, such as

smoking or activity level.  *See id.*

However, the existence of facts unique to each plaintiff does not doom the Motion.

Plaintiffs are not clones.  Thus, some degree of variation in medical etiology is expected.  Were it

otherwise, courts would never aggregate products liability cases.  *See Blount v. Bos. Sci. Corp.*,

No. 1:19-CV-0578 AWI SAB, 2019 WL 394387, at *4 (E.D. Cal. Aug. 21, 2019) (consolidating

four transvaginal mesh cases; "[W]hile Boston identified various differences [among the

plaintiffs], including differing medical histories, it does not actually explain how those differences

actually affect causation in this case. For example, simply listing different medical conditions and

identifying them as 'noteworthy' or 'significant' does not actually show how they are significant

to the issue of causation."); *McClellan v. I-Flow Corp.*, Civ. No. 07-1309-AA, 2010 WL 11595942

at *3 (D. Or. July 23, 2010) ("If the court accepted defendants' arguments [that plaintiffs'

differences demanded separate trials], consolidation would be precluded in almost any

circumstance."); *In re Montor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-

MD-2004 (CDL), 2010 WL 797273, at *3 (M.D. Ga. Mar. 3, 2010) (consolidating four cases in a medical device products liability action; opining that "[w]hile each of Plaintiffs' specific medical conditions may be different, those differences and their significance can be explained to a jury and easily understood").

Moreover, the factual distinctions that Biomet highlights pertain to the issue of causation. ELH-18-3924, ECF 199 at 18. But, as the JPML observed when consolidating Biomet lawsuits, "'almost all injury litigation involves questions of causation that are case- and plaintiff-specific.'" *In re: Biomet*, 896 F. Supp. 2d at 1341 (citation omitted). For that reason, factual differences bearing on causation do not necessarily preclude consolidation in medical device product liability actions. *See Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1314 (11th Cir. 2017) (affirming consolidation of four transvaginal mesh suits; "Although each plaintiff's proof of causation was necessarily different, generally differences in causation are not enough, standing alone, to bar consolidation of products liability claims.").

Furthermore, plaintiffs' lawsuits present common questions of law. All four plaintiffs allege that the Magnum was defective and that Biomet, despite knowing this, advertised the Magnum's safety and efficacy. And, plaintiffs pursue claims against Biomet only under Maryland law. On a more granular level, Mr. Harris, Mr. Harold, and Mr. Kandel raise the same eight causes of action. *Compare* ELH-18-3926, ECF 7 at 8-19 *with* ELH-18-3925, ECF 1 at 8-18 *and* ELH-18-3926, ECF 1 at 8-19. And, while Ms. Ringley lodges several claims not raised by the other plaintiffs, there is significant overlap; plaintiffs each assert claims of strict products liability,

negligence, and breach of implied and express warranties.[5]  Thus, I am satisfied that plaintiffs' lawsuits will present common legal questions.

Accordingly, because plaintiffs' claims share common issues of fact and law, consolidation is possible under the express terms of Rule 42(a).

### 2.  Prejudice

According to plaintiffs, consolidation poses no risk of prejudice.  ECF 196-1 at 7.  In their view, juror confusion and prejudice can be prevented with "simple safeguards," such as limiting instructions.  *Id.*  Biomet sees things differently.  It asserts that consolidation will cause unfair prejudice for two independent reasons.

First, Biomet contends that it will be prejudiced by "spillover evidence," *i.e.*, evidence that is admissible as to some but not other plaintiffs.  ECF 199 at 24.  According to Biomet, limiting instructions will "not adequately safeguard against the potential for spillover evidence" because "jurors have poor comprehension and application of limiting instructions" and instructions often "have a 'backfire effect,'" focusing the juror's attention on the impermissible evidence.  *Id.* at 26; *see generally* ECF 199-3 (Dr. Penrod Affidavit).  Second, Biomet asserts that consolidation "would violate due process" because the jury might award punitive damages based on plaintiffs' collective injuries, rather than, as the Due Process Clause requires, the harm suffered by each plaintiff individually.  *Id.* at 26; *see id.* at 25 (citing *Philip Morris v. Williams*, 549 U.S. 346, 355 (2007)).

Here too, *Campbell*, 882 F.3d 70, provides guidance.  On appeal, BSC sought to vacate the verdict on the ground that it was "prejudiced at trial by the admission of evidence in the

---

[5]  As noted, Ms. Ringley has also sued an additional Biomet entity, Biomet U.S. Reconstruction, LLC.  However, Biomet does not contend that the additional defendant militates against consolidation.

consolidated trial that was admissible as to only some of the plaintiffs." *Id.* at 75.  In particular, BSC took issue with the introduction of documents that shed light on what BSC knew about its product's safety, which were created after some of the plaintiffs had received their implants.  *Id.*

The Fourth Circuit acknowledged that "consolidation is not appropriate if it would deny a party a fair trial." *Id.*  But, it stated: "The results here were not purchased at the cost of fairness to any party." *Id.* at 76.  Spillover evidence did not taint the verdict, the Court explained, because "the district court endeavored throughout the trial to limit any potential jury confusion or prejudice resulting from the consolidation." *Id.* at 74.  The Court said, *id.* at 74-75:

> At the outset of trial, the district court instructed the jury that the trial concerned four separate claims and informed them that they must treat each as "as if each have been tried by itself." J.A. 1705–06. During the trial, BSC had the opportunity to address each plaintiff's claims independently, and in fact pursued a comparative negligence defense as to one plaintiff that it did not pursue as to the other plaintiffs. Following trial and prior to jury deliberations, the district court emphasized that the jurors were not to "even consider that more than one claim was brought" in weighing the evidence and that they must consider each case separately. J.A. 1084. To promote independent review of each case, the district court made use of special interrogatories on separate verdict forms for each plaintiff.

Characterizing the district court as having "bent over backwards to ensure that distinct questions of fact and law could be appropriately developed at trial and distinguished by the jury," the Fourth Circuit concluded that "[i]t would be inconceivable to hold that the trial court abused its discretion in these circumstances." *Id.* at 76.

The risk of prejudice to Biomet due to spillover evidence does not appear to be significant, and it does not outweigh the obvious benefits of consolidation.  To be sure, should plaintiffs' suits reach trial, there will be separate fact and expert testimony for each plaintiff.  But, like the district court in *Campbell*, the Court can utilize cautionary instructions to cabin the jury's consideration of the evidence and prevent juror confusion.

Biomet's insistence that separate trials are necessary because limiting instructions are generally ineffectual is not persuasive. "The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions." *CSX Trans., Inc. v. Hensley*, 556 U.S. 838, 841 (2009); *Francis v. Franklin*, 471 U.S. 307, 325 n.9 (1985) ("Absent such extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."); *Opper v. United States,* 348 U.S. 84, 95 (1954) ("To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions."). Accordingly, I decline to compel plaintiffs to litigate their cases separately based on the *ex ante* fear that the jury will disregard the Court's directives to the detriment of Biomet.

Likewise, there is no merit to Biomet's contention that consolidation would deprive it of due process. Regarding punitive damages, "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007). Thus, "courts cannot authorize procedures that create an unreasonable and unnecessary risk of any such confusion occurring" and must "provide *some* form of protection" to guard against improper punitive damages awards. *Id.* at 357 (emphasis in original).

However, Biomet points to no case, and the Court's limited research has not uncovered a published decision, holding that consolidating suits pursuant to Rule 42(a) violates due process if the plaintiffs seek punitive damages. To the contrary, *Campbell*, 882 F.3d 70, makes clear that the

consolidation of such a case can comport with due process. There, the jury awarded the four

plaintiffs identical punitive damages awards, which BSC argued was evidence of prejudice. *Id.* at

75. But, the Fourth Circuit found "little reason to be suspicious of the verdicts given that BSC had

a chance to fully develop its defenses and . . . the judge properly instructed the jury throughout the

trial to keep the cases separate." *Id.*; *see also Eghnayem*, 873 F.3d at 1314-15 (affirming

consolidation where jury awarded plaintiffs punitive damages). Separate verdict forms and special

interrogatives can also be employed to guide the jury to a constitutionally sound verdict.

In sum, Biomet's parade of horribles does not foreclose consolidation.

### 3. Judicial economy and convenience

Plaintiffs argue that consolidation furthers the interests of judicial economy and

convenience, contending that it will expedite discovery, streamline motions practice, and avoid

duplicative testimony. ECF 196-1 at 7-8. But, Biomet counters that the potential benefits of

consolidation in this case are illusory. ECF 199 at 27. It maintains that consolidation is not

necessary to prevent inconsistent adjudications because the plaintiffs' unique medical histories

mean that disparate verdicts are not actually "inconsistent." *Id.* Nor will consolidation promote

efficiency, according to Biomet, because separate trials are less burdensome on the Court and

jurors, minimize the potential for a mistrial or appealable mistakes, and avoid having present fact

and expert testimony specific to each plaintiff in a single trial. *Id.* at 29.

But again, the arguments that Biomet levels against consolidation run headlong into

*Campbell*, 882 F.3d 70. In affirming the district court's decision to consolidate, the *Campbell*

Court articulated the advantages of aggregation. It said, *id.* at 76:

> Ultimately, it is clear that the district court was well within its discretion in
> consolidating these four cases for trial. To hold otherwise would be to sacrifice the
> substantial savings of time and money that consolidation offers. Both plaintiffs and
> defendants benefit from lessened litigation costs and the reduced need for expert

testimony. Witnesses benefit from reduced demands on their time by limiting the need for them to provide repetitive testimony. The community as a whole benefits from reduced demands on its resources, including reduced demand for jurors. The judicial system benefits from the freedom consolidation affords judges to conscientiously resolve other pending cases.

Consolidation will advance the goals of judicial economy, efficiency, and convenience. It will benefit the parties by avoiding duplicative motions practice and reduce costs by avoiding multiple trials and the need for duplicative expert testimony; benefit the witnesses by minimize the inconvenience of testifying in multiple trials; and it will benefit the Court by resolving several cases in one trial.

### III.    Conclusion

As the *Campbell* Court recognized, consolidation is merely a "tool" for managing mass-tort actions. 882 F.3d at 76. Like any tool, what matters "is not the tool itself, but how it is utilized." *Id.*

I conclude that there are common questions of fact and law in these cases, and consolidation will not prejudice Biomet. Therefore, I shall GRANT plaintiffs' Motion. ELH-18-3924, ECF 196; ELH-18-3925, ECF 112; ELH-18-3926, ECF 109; ELH-17-747, ECF 22. Accordingly, plaintiffs' cases are consolidated for the purposes of trial.

An Order follows, consistent with this Memorandum Opinion.


Date: November 18, 2019                                    _____/s/_____
                                                          Ellen L. Hollander
                                                          United States District Judge